I represent Mr. Teeth in the trial of this cause and my first position is that we still believe that the motion to suppress should have been granted by the district court judge. I think that we established that he had legitimate expectation of privacy as an overnight guest. But he had not been an overnight guest for some three days before the time of the search, correct? That's correct. And he no longer was a resident? Not a full-time resident. According to the testimony, he was off and on resident there. And then in the night in question He had moved his possessions out though. Three weeks before the incident. That's what the facts were. However, on this night though, he was an invited guest and he was spending the night and he had been given authority to exclude certain people from the party that was taking place at Karen Russell's house. And then subsequently But that's not when the search took place. If the search had taken place that night, your argument would probably have quite a bit of force. But he left. The house sat idle for a period of days. But according to the testimony, two of one of the V.I.A. officers, they did search the premises after the fact. They did go back to the residence. They did search the residence. And they did take photographs and then presumably preserved it. And then they went back several days later and did another search after they took the They had put boards on the doors and the windows and everything else. The government said, well, no, there was a consensual search thereafter. There was no exigent circumstances, so why not get a search warrant? The government said, well, it was a consensual search because they had Eugenia Russell's permission, who was the sister of Karen Russell. But Eugenia Russell did not live there. She had no key. And they had to get the key from the housing authority to be able to get in there and search the premises. Subsequently, they used the evidence that was found within the residence, the hair, the blood and so forth, against my client in the interrogation process. And in doing so, they obtained certain very bad admissions from him. And so we, again, assert with all due respect, the district court judge erred and not granted that motion to suppress. The most important issue, I think, in this case here, for purposes of why the case should be remanded back for trial, is the request for the mistrial. And I think that I need to be able to explain to the court here, because you can't see it in the black and white, which is a disservice to the client. But when they brought Karen Russell in, that is, when the government called Karen Russell in to testify, the jury's sitting right here. But then they bring her in in a wheelchair. She doesn't sit in the witness stand, but they bring her in in a wheelchair. They have her covered with a cover. And so then they have her in. And, of course, the judge and the government obtained permission from the judge to question her, like, almost two feet from her face. And so I'm sitting there. Was there any objection to that procedure? Not in that instance because of the circumstances. So I did not object to that way of handling the questioning. However, when the government is questioning the witness, then it was important for some reason for the government to get into what the conversations were between she and my client on the night of the incident. And, of course, the witness didn't seem to understand or she said she couldn't remember. But then the government kept prodding and said, well, no, what were you talking about? What were you talking about? And she finally blurted out and said, well, he abused me. Which was completely nonresponsive. And there was a curative instruction given. Yeah. But I think the impact on the jury was evident. I mean, when you have the circumstances, this witness coming in in a wheelchair. Well, he nearly killed her. I mean, it's not as if he had nothing to do with the situation in which she appeared. I'm not arguing that the injuries were not serious. What I'm arguing is that the due process rights of my client were violated because the jury heard evidence that the judge had specifically said would not be heard. We filed a motion in limine. The government objected to it and said, no, we want it in. The judge said, absolutely not. It will not come in. And they didn't. They did not intentionally elicit it, either. But I think the point here is the impact on the jury. And then I think that whether they solicit it or not is goes to whether or not double jeopardy sets in. So I'm not arguing that, oh, gosh, give him a trial. And then I'm going to argue a new trial. And then I'm going to argue now double jeopardy sets in. If the Court finds that it was not solicited by the government, which I say differently – I believe that the record shows that the question was repeatedly asked. Yes, but the question was what did he say to you on the night of the incident, which has nothing to do with what happened six months earlier. I just – I don't understand why you think they elicited it. Well, that's the position I take because they asked the question more than once. And so if the lady could not remember, I think they should have just left it alone because of the danger that this lady might say something that was inappropriate. And she did. And so they should have ceased that particular question where she says I cannot remember and gone to the next point. But, see, what I believe is important here is the fact that it's not – if they solicited it, it's one thing. If they didn't solicit it, well, it's still a very prejudicial impact on this jury. I mean, I move for mistrial. I think the judge should have granted the mistrial. And we should have started all over again without that type of information having come in that was previously order excluded. And so for me to argue later if we get a new trial that, well, no, this is double jeopardy because it was solicited, maybe, maybe not would be appropriate. But what is important is that the response was given and the impact on the jury. And I don't think there was any way that a jury of instruction was going to blot out that thought from this jury of 12 people when they see this woman, how severely injured she is, and that she says, I've been previously abused by this man. And so I think it goes to whether he gets a new trial or not. It doesn't go to whether or not double jeopardy sets in. And I think that's the important distinction about the answer that came out during direct examination by the government of this person. And I think that logically speaking, too, when you look at the judge's reaction to the sentencing because he found her to be a vulnerable victim, he went on the fact that she was a battered woman and he was very, very impacted by the fact that presumably she had been previously abused by my client. Does it make any difference, the terms used by the judge, battered woman versus victim? I believe it does. Is that the – I mean, isn't that a sort of a common thought of condition? Well, my position – Why do we go to a dictionary to find out what was on the judge's mind? In the context in which he said it, he was concerned that she was not his equal in strength, ability, firearms, or anything else. That's what he was talking about. But I think in the context that it was put into PSR and the way it was used by the judge and commented upon repeatedly during the sentencing process of this case, he was using it as a – more of a medical term that she's a battered woman. I have a question about that argument. Are you trying to tie that to the alleged trial error or – because he could presumably have such evidence at sentencing even if the comment had not been blurted out during the trial. So I wasn't clear whether you were trying to tie those things together or what you were saying specifically about the enhancement. What I was making is that when you say, well, it's not prejudicial error because the lady blurted it out and it was not solicited by the government, I think that's not the case. I mean, you have 12 people who are very emotionally impacted by a medical error. Okay. But we're now talking about the sentencing. That's what I was trying to get. I am back to what does the jury believe? If this judge – But the sentencing has to do with what the judge believes at the end, and that – If you saw this woman sitting in the wheelchair and they see what happened here, and you have the judge reacting to that same information for purposes of sentencing, I think that it's common sense to tell you that the jury, no matter what period of instruction was given – I see what you're saying. Okay. You're tying it backwards, not forwards. I understand what you're saying. I'd like to reserve my last word. You certainly may. We'll hear from the government. May it please the Court. My name is Marcia Hurd, and I'm an AUSA from the District of Montana in the Billings Office. I tried this case in the lower court, and I also wrote the brief. The issue that the defense believes is so critical in this case is the motion for mistrial. And I think that the Court has hit it squarely on the head. This was a woman who was gravely impaired by what happened to her. I was asking her at trial questions about the discussions they were having that night, because we knew from statements she had made to law enforcement what those discussions were, and they were important to the issues in the case. And she, in the middle of that, literally just blurted out the statement that she made that he is complaining of. We all immediately went to sidebar, as is apparent from the record. And I even asked that the Court strike that comment, because it was nonresponsive and we had all agreed to stay away from that area. You have to understand this is a woman who was severely injured and had limited capabilities in terms of being able to respond to the questions that were being asked. She didn't commit any more of those kinds of comments into the record. The jury was immediately admonished to disregard, was admonished again in the final arguments or in the final instructions to disregard any evidence that had been told by the Court to disregard. And so the jury is presumed to have followed those instructions in this case. Could you just go back to the motion to suppress for a moment and clarify the events on the night in question? The events occurred, the beginning of this party occurred on August 5th, when the parties all met up at the Kirby's house. Yes. The parties were at the house through the evening of August 5th and into the morning hours of August 6th. Two of the four people there, Contessa and her husband. And there's no dispute that he was going to be an overnight guest that night? There had never been any discussion about him being an overnight guest. In fact, these people had broken up. He had taken all of his things and he had left for reasons that are not necessarily contained within this record. Right. But he didn't live there anymore. And there is absolutely nothing in this record that indicates he was intended to be an overnight guest. Well, the evidence at that hearing seemed to say that came out through the officer testified that he was an overnight guest. Well, he was certainly there for the party, as were other people. The party ended at about 2 or 2.20 in the morning when the two people left, Contessa and Waylon, and that left Neal Teeth and Karen there. It is after that when the assault took place. Karen was injured and was injured so grievously that she no longer apparently had the capabilities of speech or movement, according to the doctors, and he just continued to be there. So there's nothing in the record that indicates specific permission to be there, but certainly he was there with her permission for at least the party part of it until 2 or 2.20 in the morning, and that would be on August 6th. She's basically laying comatose during the day on August 6th, and it is the chance meeting where Neal Teeth is driving her car in the evening of the 6th, and her mother happens to drive by. So how long does she remain in the house? Until the evening of August 6th. So basically she's injured in the morning of August 6th, somewhere after 2.20 in the morning, and it is until 7 o'clock that night. So a period of, you know, a fairly long day before she's actually taken to the hospital in Lane Deer. When her mother says she needs to be taken, she gets to the hospital much later in the evening, is triaged, is in critical condition, and then is flown to Billings, attempted to be flown but had to be driven because of the weather, and gets there into the next morning, about 12.30. And now we're into the 7th. Yes.  So when do they go out to inspect the house? They talk to her sister, Eugenia, on the 9th, and she signs the consent to search, and they actually do the search on August 10th. Okay. So between the 7th and the 9th, they haven't done any searching? They've done no searching, and Neal Teeth is not at the residence. Nobody is at the residence. All right. Thank you. So on the 10th, they actually do the first search, and then they go back and do a more thorough search on August 17th, because at this point, they don't know who injured this woman or what happened to her. Now, the record doesn't reflect what's going on at her little place between the morning of the 6th, after she's picked up, I guess, the morning of the 7th, and the time the police go out, I guess, about two days. There's a little bit of discussion from Karen's mother that she had to stop and get clothing for Karen's children because Karen's children were staying part-time with Karen's mother at that point, and she needed to get clothes for the kids when she went to the hospital and arranged for somebody else to take care of them. And we know later through the testimony that there's some yellow tape that's placed around there, but I couldn't quite figure out exactly when that occurred. And it is – it's not secured in the best of all fashions, but it was secured when people realized, well, that's where she came out of. Is that the crime scene, or did she get hurt somewhere else? And so they do put tape up. You have to understand this is an Indian reservation. Right. This is not – you know, it's a very rural area, a very small town, and it's not the same as it might be in a larger city. So the first search is August 10th. The second search is August 17th. And they don't actually talk to Neal Teeth until down into September. His first statement is September 28th. And then his second statement, where he signs the written confession and fails the polygraph, is December 27th. So those occur significantly later in the scheme of events. I have a question about the sentencing, and more specifically about the vulnerable victim enhancement. And my specific concern is whether the judge's findings are sufficient to invoke that guideline, and both in terms of the substance of them and whether there's a factual grounding. So if you'd just talk about that for a minute, I'd appreciate it. Well, I think some of that was based on – I believe there was a motion in limine that was filed to keep out prior evidence of abuse. And so the judge was obviously aware that there had been prior evidence of abuse. And we all agreed not to talk about that at trial. So he was aware of that. Charges had been filed earlier in tribal court, had been dismissed. And there was another incident where she refused to even file charges, and she actually ended up in the hospital, although not as seriously injured as here. So the judge had known all those things. In terms of making his finding for sentencing purposes, he also had more information in the pre-sentence report about the fact that she was a battered woman. He also considered the note that Neel Teeth had left to her that is contained in the record. We admitted that at trial. It's at ER-460. The note where Neel threatens her, basically it's a note that we found afterwards that if she isn't home when he comes back from where he's going across the street to sweat, you know, basically he's going to assault her. And then also the letters that he wrote her afterwards, which are typical battering defendant letters, the I'm sorry, I shouldn't have hurt you, I shouldn't have put you in the hospital. So he considered all three of those letters, the note and all the prior incidences of abuse that she had first prosecuted and then refused to. And I think there are very substantial facts in this record from which the Court could make that vulnerable victim finding, that she was a victim of both domestic abuse and that she was pregnant, and that both parties knew she was pregnant at the time of this assault. And that those two things and her continued psychological dependence on this man, an inability to get away from him, and to report him when he'd done things to her, made her more vulnerable than it would have made somebody else that he'd assaulted. Say he'd assaulted Contessa, the other girl who was there that night, or someone else with whom he didn't have that kind of an already established battering relationship. Let me ask you, does the – if I'm recalling this correctly, the district court judge gave the maximum statutory sentence. He did. Is that correct? And said it was not sufficient, but it was the best. Right. So does any of this make any difference to you? It really doesn't. I mean, if you look at Muhammad, under Muhammad, you can look at each, you know, because first under Cantrell, we're supposed to make the proper guideline finding. But then under Muhammad, there's a slightly different twist to that, that you can also look at the reasonableness of the sentence and not specifically deal with each of these issues. And I think the judge was clear, and I think the evidence is clear, that 10 years was not enough for almost killing this woman. I got the impression if he could have given more, he would have. He would have. I think that's very clear from the record. Okay. If there are no other questions from the panel, thank you for your time. I think that – thank you. You do have some rebuttal time remaining. Thank you very much. With the time that I have left, I would like to comment on the sentencing aspect of the case, and number one, about the obstruction of justice. It seems to me that my client did nothing to impede the investigation of the case. He gave false statements. He gave false statements, but the investigation was continuing on. They said that if believed – I think the language that is quoted is that if the Well, they must have believed it because they didn't start questioning him for quite some time. But they focused their investigation on him instantaneously. I mean, I think the circumstances surrounding taking the victim to the hospital and so forth, I think that right from the get-go, he was the target of the investigation. And I think that you can't use a person's denial. I think that's his right and it cannot be used for enhancement purposes when he says, well, I'm not guilty of this offense. And so he may say things that may not be true or otherwise, but it did not impede the investigation. I mean, the searches still took place at the house without search warrants that were complaining about. There was interviews of other people. Well, let me ask you the sort of the final question I think that Judge Pius was going to, and that is, when the judge makes clear that regardless of how the guideline calculation comes out, the guidelines are advisory, and the absolute only sentence that he felt was appropriate was the maximum sentence because had the timing been slightly different or the doctors been slightly not as good, this would have been a murder case. And as it was, the maximum sentence wasn't that great in the judge's mind. Why doesn't that make all the calculation issues harmless error, if they're error at all? I think because we allege that was from 46 to 57 months, level 21 versus 25, and with the enhancements that the court found to be appropriate, which we disagree with, when you take 46 to 57 months and then all of a sudden you tag on 120 months, there's such a great disparity between the advisory guidelines and the ultimate sentence. I think it gives less meaning to the guideline. That's a different question than the one I'm asking. You're leaving aside the quote, unquote, reasonableness piece, but looking only at the piece that deals with whether the enhancements were properly applied. In view of the court's determination to use the statutory maximum, what difference would it have made had he said, well, there aren't any enhancements that apply, but, and then had given the same speech and the same sentence. So I guess what difference did those make? That's a good question. And I think under these circumstances in this case, I think the judge's intent was to give him what he could, statutorily maximum. And so I guess all this talk about the guidelines may not be all that important. But again, I think that we're obligated, if we're going to apply these things and the reasons that the guidelines are implemented according to our district court judges is because it provides for consistency. And so when you go outside of the guideline range to such a great degree that the judge did in this case, then I don't know what it does to the applicability. Well, theoretically, even under the old mandatory guidelines, the judge could have departed upward. You know, all he had to do was give a good reason to do it. That's true also. But again, I think that the most important and crucial point that we can make here is that there should be a new trial because of the impact of that statement by Karen Russell about the fact that she had been previously abused. The judge said, do not go into that. It was gotten into. And we're not talking double jeopardy here. We're simply talking, let's give this man a new trial in front of a new jury where that information is not brought in, because I think the impact is just absolutely obvious, and no curative instruction in the world is going to take that thought out of their minds. Thank you, counsel. We appreciate the arguments of both parties. They were very helpful. And the case just argued and submitted.         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Beezer, Graber, Paez